**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| DEEPAK R. PATEL, on behalf of himself And all individuals similarly situated 3071 Walkerview Dr. Hilliard, OH 43026 | : : : : : |
| Plaintiff, | : : |
| v. | : : CASE NO. 21-1837 |
| WELLS FARGO BANK, N.A. c/o Corporation Service Company 50 W. Broad St., Suite 1330 Columbus, OH 43215 | : : : : : |
| Defendant. | : |

**CLASS ACTION
COMPLAINT**

Now comes DEEPAK R. PATEL ("Plaintiff") and sets forth below his COMPLAINT against WELLS FARGO BANK, N.A. ("Defendant"). Plaintiff's COMPLAINT contains CLASS Claims.

JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this matter because Plaintiff's case seeks, in part, to resolve a federal question within the meaning of 28 U.S.C. §1331, and in particular, whether Defendant violated provisions of the Real Estate Settlement Procedures Act ("RESPA") found at 12 U.S.C. §2601 et seq. This Court has supplemental jurisdiction over Plaintiff's other claims as they are so related to his federal claims that they form part of the same case or controversy within the meaning of 28 U.S.C. §1367(a).

1

2. This Court maintains personal jurisdiction over Defendant based upon Defendant's (i) business contacts within this federal district; (ii) presence within this federal district, and (iii) consent to personal jurisdiction within this federal district.

3. This Court is the proper venue for this action pursuant to 28 U.S.C. §1391(b)(2).

## ALLEGATIONS

4. In 2004 Plaintiff and his mother, Rita Patel, purchased real property located at 3071 Walkerview Dr., Hilliard, OH 43026 to use as their family residence ("Residence").

5. In 2015, Plaintiff refinanced the Residence.

6. Defendant acquired the rights to the first mortgage, and transferred the servicing of the debt to its wholly owned subsidiary Well Fargo Home Mortgage.

7. Plaintiff signed a Note in the amount of $238,000.00 payable at the per annum rate of 3.125%.

8. A true and authentic copy of the Note, and its Allonge to Defendant, are attached hereto and incorporated herein as EXHIBIT A.

9. Plaintiff further signed a Mortgage granting Defendant the Residence as security.

10. A true and authentic copy of the Mortgage is attached hereto as EXHIBIT B.

11. As of January 31, 2018, Plaintiff's principal on the loan serviced by Defendant was $202,274.83.

12. In February and March 2018, Mr. Patel made additional $31,077.00 in principal payments on his loan account. Defendant's business records and Plaintiff's mortgage statements reflect the payments as follows:

    a. 2/14/2018     $ 2,400.00

    b. 2/15/2018     $ 5,785.93

      c. 2/15/2018    $ 2,454.07

      d. 2/21/2018    $ 2,537.00

      e. 2/22/2018    $ 1,800.00

      f. 3/12/2018    $14,200.00

      g. 3/21/2018    $ 1,900.00

13. On March 22, 2018, Plaintiff filed a Chapter 7 bankruptcy case in the Southern District of Ohio, Eastern Division, in the case of *In re Deepak R. Patel*, Case No. 2:18-bk-51651 (Bankr. S.D. Ohio 2018).

14. At the time of his bankruptcy filing, Plaintiff was current on his monthly principal, interest, and escrowed taxes and insurance ("PITI") payments on the debt owed on the Residence.

15. As of April 6, 2018, Mr. Patel owed $170,136.02 in principal.

16. On June 12, 2018, Plaintiff entered into a reaffirmation agreement with Defendant.

17. A true and authentic copy of the reaffirmation agreement is attached hereto as EXHIBIT C.

18. Plaintiff also made each of regularly scheduled monthly PITI payments from February 2018 through January 2019 (and for every month thereafter).

19. During the bankruptcy case, the Chapter 7 Trustee ("Trustee") sent written demands to Defendant for the turnover of the $31,077.00. The Trustee never notified Plaintiff of her actions. The Trustee commenced no formal adversary proceeding against Defendant, and upon receipt of the funds, the Trustee never sought approval of any compromise with Defendant in the Bankruptcy Court.[1]

---

[1] The Trustee's unilateral actions spawned, *inter alia*, a discharge complaint by her against Plaintiff, and conversion counterclaims against the Trustee by Plaintiff. To summarize, the $31,077.00 comprised equity in Plaintiff's homestead which Plaintiff lawfully claimed as exempt under both Bankruptcy and Ohio law. The Trustee did not timely object to Plaintiff's claimed objection, and therefore the $31,077.00 in equity was not bankruptcy estate

20. On or around January 15, 2019, Defendant unilaterally sent the Trustee $31,077.00 and then made a series of additions to principal to Plaintiff's account.

21. In communications dated 1/14/2019, 1/16/2019, and 1/18/2019 respectively, Defendant informed Plaintiff that he was, inexplicably, in "Default" and demanded that Plaintiff bring the account "current" by paying Defendant $14,667.78 by February 1, 2019, which included Plaintiff's regular PITI payment for February 2019.

22. Plaintiff would also learn further that Defendant hired a well-known foreclosure law firm to enter an appearance in his bankruptcy case to proceed to lift the automatic stay. Plaintiff understood this filing to be a precursor by Defendant take action against Plaintiff and the Residence in State Court.

23. Confused, Plaintiff contacted Defendant by telephone to discuss the letters he received and specifically questioned why his account was in default, and why Defendant would hire counsel in light of the parties' reaffirmation agreement.

24. Defendant's representatives stated that Defendant's records established that he was behind by several months after the reversal of the $31,077.00, and that unless Plaintiff immediately paid Defendant at least the amount due as shown on Defendant's "system" through January 2019, Defendant would be required to take steps to accelerate the Note and bring a foreclosure action.

25. Based upon Defendant's treatment of his account as being in default and Defendant's threats of acceleration and foreclosure, Plaintiff felt compelled to pay Defendant the amount it demanded, as further specified below.

---

property over which the Trustee had the authority to control. The parties to that litigation resolved their differences by a settlement agreement. Defendant was not a party to that litigation.

26. On January 17, 2019, Plaintiff paid Defendant $12,032.37 (the amount due through January 2019); and the balance (of the originally $14,667.78 demanded) comprised Plaintiff's February 2019 PITI payment which he timely paid by February 1, 2019.

27. Plaintiff has always timely made his contractual PITI payments on the subject mortgage account. Plaintiff has never been in default, notwithstanding Defendant's attempted and improvident reversal of Plaintiff's $31,077.00 additional principal payments.

28. A letter dated June 4, 2020 was directed to Defendant to outline Plaintiff's concerns and claims.

29. A true and authentic copy of Plaintiff's June 4, 2020 letter is attached hereto as EXHIBIT D.

30. Defendant acknowledged receipt of Plaintiff's June 4, 2020 letter by letter dated June 11, 2020 proposing to reply after investigating by June 25, 2020.

31. A true and authentic copy of Defendant's June 11, 2020 letter[2] is attached hereto as EXHIBIT E.

32. Defendant next sent Plaintiff a letter dated June 25, 2020 unilaterally extending its response date to July 9, 2020.

33. A true and authentic copy of Defendant's June 25, 2020 letter is attached hereto as EXHBIT F.

34. Defendant next responded by letters dated July 7, 2020 and July 9, 2020.

35. A true and authentic copies of Defendant's July 7, 2020 and July 9, 2020 letters are attached hereto as EXHIBITS G and H.

---

[2] Defendant sent an identical letter dated June 12, 2020 for unexplained reasons.

36. Defendant's letters contained no internal business records to substantiate the conclusions Defendant reached therein. However, the letters invited Plaintiff's counsel to call to request such records.

37. On or around July 16, 2020, Plaintiff's counsel called Defendant's representative, Roger Anderson. During the call, Mr. Anderson, the author of Defendant's letters, was eager to discuss the merits of Defendant's conclusions and positions, but Plaintiff's counsel declined to engage in the discussion and instead requested that Defendant produce the documentation and records it relied upon to prepare the July 7 and July 9 letters. Mr. Anderson seemed confused by the request even though the letters clearly proposed such a procedure. Mr. Anderson claimed that such a request had to be made in writing and had to be faxed to Defendant's attention.

38. On or around July 16, 2020, Plaintiff's counsel faxed a letter to Mr. Anderson (to the fax number provided) seeking, *inter alia*, numerous records and documentation, and further demanding the Defendant take efforts preserve all of its data and records pertaining to the matter.

39. A true and authentic copy of Plaintiff's July 16, 2020 letter is attached hereto as EXHIBIT I.

40. Defendant acknowledged receipt of Plaintiff's July 16, 2020 by letter dated July 17, 2020.

41. A true and authentic copy of Defendant's July 17, 2020 acknowledgment letter is attached hereto as EXHIBIT J.

42. Next, by letter dated July 30, 2020, Defendant's previously unknown representative, Shad Vanderplaats replied. The only document Mr. Vanderplaats provided was something entitled "Customer Account Activity Statement" ("CAAS"). The CAAS appears to be an

   EXCEL spreadsheet prepared by Defendant's representatives after Plaintiff's July 16, 2020 request, and perhaps was selectively populated with Defendant's data from its internal mortgage servicing platform.

43. A true and authentic copy of Defendant's July 30, 2020 reply is attached hereto as EXHIBIT K.

44. Plaintiff engaged in a comprehensive review of the CAAS, together with his own records. Plaintiff was unable to reconcile the information in any way that would support Defendant's conclusions that he was in "Default".

45. On or around September 11, 2020, Plaintiff faxed another lengthy letter to Defendant, further outlining his concerns and making many observations about the data contained in the CAAS, inclusive of serious concerns over the administration of what appeared to be shortages in Plaintiff's escrow accounts, and the use of an "unapplied funds" accounting system. Further, Plaintiff specifically warned Defendant that its prior responses were not in compliance with RESPA, and that he was reserving his rights under RESPA (12 U.S.C. §2605(e) and (f)).

46. A true and authentic copy of Plaintiff's September 11, 2020 letter is attached hereto as EXHIBIT L.

47. Defendant acknowledged receipt of Plaintiff's September 11, 2020 by letter dated September 15, 2020, proposing a reply by September 25, 2020.

48. A true and authentic copy of Defendant's September 15, 2020 letter is attached hereto as EXHIBIT M.

49. Defendant's next communication was a letter dated October 9, 2020, proposing to reply by October 24, 2020.

50. A true and authentic copy of Defendant's October 9, 2020 letter is attached hereto as EXHIBIT N.

51. Defendant's next communication was a letter dated October 23, 2020, proposing a reply by November 6, 2020.

52. A true and authentic copy of Defendant's October 23, 2020 letter is attached hereto as EXHIBIT O.

53. Defendant's next communication was a letter dated November 6, 2020 proposing to reply by November 17, 2020.

54. A true and authentic copy of Defendant's November 6, 2020 letter is attached hereto as EXHIBIT P.

55. Defendant's next communication was a letter dated November 16, 2020, wherein Defendant's previously unknown representative, Lynda Sparr, made a series of barely understandable, but self-serving conclusions, in which she claimed remarkably, that in spite of threatening Plaintiff with the loss of his family's home, Plaintiff "has not been financially impacted", and that Defendant's actions have actually inured to Plaintiff's "benefit". As with all of Defendant's prior letters, Defendant's representatives provided no supporting records or documents.

56. A true and authentic copy of Defendant's November 16, 2020 letter is attached hereto as EXHIBIT Q.

57. Defendant's final communication in response to Plaintiff's requests for information and account correction came in an unsolicited letter dated December 1, 2020, to supplement Defendant's prior responses.

58. A true and authentic copy of Defendant's December 1, 2020 letter is attached hereto as EXHIBIT R.

59. Defendant's actions related to administration of Plaintiff's loan account have caused Plaintiff actual damage in numerous ways, including but not limited to:

   a. Loss of use of $12,032.37 since January 17, 2019;

   b. Damage to credit, and loss of credit resulting from Defendant's inaccurate declaration of home loan default;

   c. Humiliation, embarrassment, and emotional distress resulting from Defendant's inaccurate declaration of home loan default;

   d. Loss of $31,077.00 in home equity since January 15, 2019;

   e. Legal fees and costs;

## COUNT I – VIOLATIONS OF RESPA

60. All statements made in all preceding paragraphs are incorporated into this COUNT as if fully rewritten.

61. Plaintiff's loan is a federally related mortgage loan within the meaning of 12 U.S.C. §2602(1).

62. Defendant is a servicer who services Plaintiff's loan within the meaning of 12 U.S.C. §2605(i)(2) and (3).

63. Defendant owed Plaintiff a statutory duty to take appropriate action with respect to at least one (1) of his qualified written requests ("QWRs") as required by 12 U.S.C. §2605(f).

64. Plaintiff sent Defendant inquiries dated June 4, 2020, July 16, 2020 and September 11, 2020.

65. Each inquiry constituted a separate QWR within the meaning of 12 U.S.C. §2605(e)(1)(B).

66. Plaintiff explained in each inquiry the specific nature of his concerns which can be summarized more generally as follows: that after Defendant unilaterally sent the Trustee $31,077.00, Defendant declared Plaintiff's loan account in default and required him to pay over $12,000.00 to avoid the consequences of a default under the Note and Mortgage - acceleration and/or foreclosure. The $31,077.00 sent to the Trustee represented prior principal reduction payments made by Plaintiff, and at all times before and after such prior principal reduction payments, Plaintiff had made timely monthly PITI payments according to Plaintiff's home loan's amortization schedule, and had never been in payment default or any other default. Plaintiff's account needed corrected, rectified and explained.

67. With respect to Defendant's duties under RESPA to take appropriate action as to:

    a. Plaintiff's QWR dated June 4, 2020:

        i. Defendant acknowledged receipt of such QWR by letters dated June 11, 2020 and June 12, 2020 respectively (identical letters) and proposed to respond by June 25, 2020.

        ii. By letter dated June 25, 2020, Defendant informed Plaintiff that it proposed to respond by July 9, 2020 which is beyond 30 days following Defendant's receipt of Plaintiff's QWR.

        iii. Defendant's June 25, 2020 letter did not comply with 12 U.S.C. §2605(e)(4) because Defendant failed therein to articulate the reasons for Defendant's delay in responding, and was therefore ineffective.

        iv. Defendant's next letters dated July 7, 2020 and July 9, 2020 respectively (identical letters) were provided to Plaintiff more than 30 days in violation of 12 U.S.C. §2605(e)(2).

    b. Plaintiff's QWR dated July 16, 2020:

        i. Defendant acknowledged receipt of such QWR by letter dated July 17, 2020.

        ii. Defendant provided Plaintiff with a letter dated July 30, 2020 and the CAAS – which is an 8-page spreadsheet prepared by Defendant after Plaintiff's July 16, 2020 QWR.

        iii. Yet, Plaintiff's QWR reasonably requested several items of information: (1) a copy of the phone 7/16/2020 call which Defendant represented was recorded; (2) Defendant's internal account ledger for Plaintiff's loan; (3) copies of documents between Defendant and the Trustee; (4) copies of documents generated by Defendant following Plaintiff's June 4, 2020 QWR; (5) identities of the employees who dealt with the adjustments to Plaintiff's account following the Trustee's letters; (6) Defendant's account adjustment procedures in bankruptcy; and (7) all other documents Defendant relied upon to determine the facts and conclusions reached in Defendant's July 7, 2020 and July 9, 2020 letters.

        iv. Defendant's July 30, 2020 response violated 12 U.S.C. §2605(e)(2)(C)(i) because Defendant did not provide Plaintiff the information he requested nor did it provide an acceptable, reasonable, or legally cognizable explanation for why the information requested was unavailable or could not be obtained by the servicer.

    c. Plaintiff's QWR dated September 11, 2020:

        i. Defendant acknowledged receipt of such QWR by letter dated September 15, 2020.

    ii. Defendant provided Plaintiff with subsequent letters dated October 9, 2020, October 23, 2020, and November 6, 2020 respectively, each of which proposed to respond to Plaintiff's QWR more than 30 days following its receipt.

    iii. Defendant's October 23, 2020 and November 6, 2020 letters further sought to unilaterally take more than 15 additional days beyond the original 30 days in violation of 12 U.S.C. §2605(e)(4).

    iv. Defendant's October 23, 2020 and November 6, 2020 letters further violate 12 U.S.C. §2605(e)(4) because Defendant failed therein to articulate the reasons for Defendant's delay in responding, making both of such letters ineffective.

    v. Defendant's final replies dated November 16, 2020 and December 1, 2020 respectively were thus provided to Plaintiff more than 30 days following Defendant's receipt of Plaintiff's September 11, 2020 QWR in violation of 12 U.S.C. §2506(e)(2).

    vi. Defendant violated RESPA further by virtue of its reply letters dated November 16, 2020 and December 1, 2020 because in spite of each letter, Defendant failed to take appropriate corrective action with regard to Plaintiff's account in violation of 12 U.S.C. §2506(e)(2)(A), but instead offered ineffectual and unsatisfactory explanations for Defendant's loan accounting.

### COUNT II – BREACH OF CONTRACT

68. All statements made in all preceding paragraphs are incorporated into this COUNT as if fully rewritten.

69. The Note and Mortgage constitute separate written contracts under both Ohio and Federal law.

70. The Note and Mortgage each contain numerous express obligations, covenants and duties which must be followed by Plaintiff and Defendant, and each contract contains implied covenants to deal fairly and act in good faith.

71. Under the Note, Plaintiff had the right prepay the loan by making additional principal payments.

72. Defendant, under the Note, was obligated to apply Plaintiff's prepayments of principal, as long as Plaintiff was otherwise current on the loan.

73. At all times relevant hereto, Plaintiff was always current in making his PITI payments pursuant to the Note.

74. Plaintiff paid at least $31,077.00 in principal prepayments, and Defendant applied them as such.

75. Without providing prior notice to Plaintiff, Defendant engaged in a series of loan accounting reversals of the $31,077.00 in principal prepayments on or around June 11, 2020 in amounts incrementally different than the amounts originally incrementally paid by Plaintiff.

76. The principal payment reversals in question, upon information and belief, created on Defendant's servicing platform, mathematical discrepancies, that upon further information and belief, caused Defendant to errantly believe that Plaintiff's account was in payment default.

77. Defendant breached the Note and Mortgage by improperly accounting for the payment reversals, and declaring the account in payment default.

78. Defendant further breached the Note and Mortgage's implied covenants of good faith and fair dealing by falsely representing that Plaintiff's account was in default, and by

       demanding that Plaintiff pay at least $12,032.37 under threat of possible acceleration and home foreclosure.

79. Defendant's breach of contract caused Plaintiff to unnecessarily pay $12,032.37 and to unnecessarily incur legal fees and expenses.

80. Plaintiff has lost the use of his $12,032.37 since January 17, 2019.

81. Defendant's unilateral principal payment reversals and tendering of $31,077.00 to the Trustee were done without notice to Plaintiff and were legally improvident as such principal payments never constituted preferential transfers or fraudulent transfers under State or Federal law.

82. Defendant's engagement with the Trustee and delivery of the $31,077.00 without notice or any form of due process to Plaintiff breached the parties' Note and Mortgage, and the implied covenants of good faith and fair dealing.

83. As a direct and proximate result of Defendant's unilateral actions, Plaintiff also lost the use of his $31,077.00 and lost over $39,000.00 in legal fees and other costs, dealing with the Trustee.

## COUNT III – CONVERSION OF EQUITY AND MONEY

84. All statements made in all preceding paragraphs are incorporated into this COUNT as if fully rewritten.

85. Plaintiff gave Defendant $31,077.00 to apply to the principal of the subject loan, and Defendant did so, thereby reducing the principal balance of the loan, and thereby creating equity in the Residence in an amount valued at least at $31,077.00.

86. Plaintiff was the lawful owner of $31,077.00 in funds before they were delivered to Defendant, and Plaintiff was the lawful owner of the equity in the Residence at all times relevant hereto.

87. The $31,077.00 in principal prepayments were fully capable of identification and were earmarked for principal payment reduction.

88. Defendant, without notice or due process to Plaintiff, exercised unilateral control of the $31,077.00 worth of funds, and/or of equity in the Residence, and disposed of such property against Plaintiff's rights of ownership.

89. Plaintiff was damaged in the amount of the loss of $31,077.00 and $39,000.00 in legal fees and costs unnecessarily incurred litigating issues regarding the property with the Trustee.

90. Plaintiff further paid Defendant $12,032.37 in money, under the false pretenses of loan default.

91. Defendant took dominion and control over the $12,032.37 and applied such funds, in currently unsatisfactorily explained parts, to pay unexplained expenses, interest, fees and/or costs, and to prepay some amount of principal on the loan, all against Plaintiff's wishes, but also creating some amount of equity in the Residence by loan principal reduction.

92. Plaintiff is the lawful owner of the $12,032.37, and the owner of the equity in the Residence.

93. The payment of $12,032.37 is fully capable of identification by reference to Defendant's records and mortgage loan servicing platform.

94. Defendant has willfully deprived Plaintiff of the use of this $12,032.37 since January 17, 2019.

95. Plaintiff has been damaged by Defendant's improper exercise of dominion and control over the $12,032.37 by lost interest, and opportunity over its use.

96. Defendant's exercise of control of the $12,032.37 was/is/has been willful and/or engaged in with reckless disregard for Plaintiff's rights. Further, Defendant acquired Plaintiff's $12,032.37 under improper pretenses and has failed to correct or rectify the situation, or return the funds, making Defendant subject to punitive damages to the maximum extent permissible under Ohio law.

### COUNT IV – INFLICTION OF EMOTIONAL DISTRESS

97. All statements made in all preceding paragraphs are incorporated into this COUNT as if fully rewritten.

98. Defendant should have known that its unilateral reversal of Plaintiff's $31,077.00 worth of principal payments would cause Plaintiff great concern and should have notified him before sending the money to the Trustee.

99. Defendant should have further known that declaring Plaintiff's loan account in default and demanding $12,032.37 in immediate payment or be subject to acceleration and home foreclosure would cause extreme emotional distress, humiliation, anxiety and embarrassment.

100. The manner in which Defendant engaged in unilaterally sending the Trustee $31,077.00, unfairly declaring Plaintiff's account in default, and demanding and taking control of Plaintiff's $12,032.37, was extreme and outrageous, given the fact that Defendant should have known that Plaintiff was never in default.

101. Defendant's threats of acceleration and foreclosure directly and proximately caused Plaintiff to suffer extreme emotional distress, anxiety, humiliation and embarrassment.

102. Plaintiff is entitled to recover for such distress and punitive damages should be imposed against Defendant for its outrageous conduct.

### CLASS COUNT– RESPA – VIOLATION OF 12 U.S.C. §2605(e)(2) and (4)

103. All statements made in all preceding paragraphs are incorporated into this COUNT as if fully rewritten.

104. Upon information and belief, Defendant receives thousands of QWRs from borrowers on an annual basis.

105. Upon further information and belief, Defendant sends borrowers thousands of form letters which are used to "update" borrowers about Defendant's research as to the borrowers' QWR inquiries ("Update Letters").

106. RESPA requires, *inter alia*, that Defendant take appropriate action under RESPA with respect to its borrowers' QWRs within 30-days following receipt of the same.

107. RESPA permits Defendant to extend the 30-day period for not more than 15-days if, before the end of such 30-day period, if Defendant notifies the borrower of the extension and the reasons for the delay in responding.

108. Upon information and belief, Defendant operates pursuant to a faulty business model that causes it to unilaterally take multiple extensions before taking appropriate action under RESPA in violation of its duties to its borrowers.

109. Upon further information and belief, Defendant adopted and uses a form Update Letter to take such extensions which on its face violates RESPA because such forms do not provide the borrower with any reason for Defendant's delay in responding.

110. Defendant's use of (i) the faulty form Update Letter; and (ii) the process to unilaterally take more than one 15-day extension for taking action under RESPA constitutes a pattern or practice of noncompliance with 12 U.S.C. §2605.

111. Plaintiff's case offers prime examples of Defendant's RESPA misconduct.

112. For example, Plaintiff's QWR dated September 11, 2020, was received by Defendant on or before September 15, 2020. Assuming *arguendo* that September 15, 2020 was the receipt date, Defendant was statutorily obligated to take action on before October 15, 2020. Defendant was permitted one (1) 15-day extension if Defendant timely and properly notified Plaintiff. Yet, Defendant's October 23, 2020 and November 6, 2020 letters sought to unilaterally take more than 15-additional days beyond the original 30-days in violation of 12 U.S.C. §2605(e)(4).

113. In addition, Defendant's form Update Letters, exemplified herein at EXHIBITS F,N,O, and P, and which were used by Defendant to extend time to take action, further violate 12 U.S.C. §2605(e)(4) because they failed to notify Plaintiff of the "reasons for the delay in responding".

114. Plaintiff seeks to represent a nationwide class of individuals (CLASS 1) from whom:

   a. Defendant received a QWR;

   b. Within 3-years of the filing this complaint;

   c. To whom Defendant sent one or more form Update Letters.

115. Plaintiff seeks to represent a nationwide class of individuals (CLASS 2) from whom:

   a. Defendant received a QWR;

   b. Within 3-years of the filing of this complaint;

   c. To whom Defendant sent one or more form Update Letters;

    d. The effect of which extended Defendant's time to take action for more than 45 days following receipt of such individual's QWR.

116. Each CLASS described is comprised of thousands of individuals and is thus so numerous that joinder would be impracticable.

117. Each CLASS shares many common questions of law and fact.

118. Plaintiff's RESPA claims and Defendant's defenses thereto under 12 U.S.C. §2605 are purely typical of the claims of the members of each CLASS, and of Defendant's defenses thereto.

119. Plaintiff can fairly and adequately represent each CLASS, has competent counsel, and has no interests antagonistic to either CLASS.

120. Identification of the members of each CLASS is objectively ascertainable by reference to Defendant's records and servicing platform.

121. RESPA expressly calls for class relief at 12 U.S.C. §2605(f).

122. A class action here should be maintained for two principal reasons:

    a. Defendant's actions to (i) use faulty forms – the Update Letter; and (ii) to take unilateral extensions beyond the time permitted under RESPA, apply generally to each CLASS, so that final injunctive relief or corresponding declaratory relief is appropriate respecting each CLASS as a whole; and/or

    b. Defendant's actions to (i) use faulty forms – the Update Letter; and (ii) to take unilateral extensions beyond the time permitted under RESPA involve questions of law or fact common to class members which predominate over any questions affecting only each CLASS' individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

123. Plaintiff will timely file and prosecute a motion for class certification which will likely key on certain issues pursuant to Fed. R. Civ. P. 23(c)(4), and which will include the issue of Defendant's liability for violating 12 U.S.C. §2605(e), and the issue of additional statutory damages under 12 U.S.C. §2605(f)(2)(B) for each CLASS.

WHEREFORE, Plaintiff seeks judgment against Defendant on his above described individual claims, and upon his class claims which he will further articulate by separate motion. Plaintiff further seeks any and all other relief to which he may be legally and equitably entitled.

        Respectfully submitted,

        JENESQ

        /s/     James E. Nobile
        James E. Nobile (0059705)
        Eric E. Willison (0066795) Of Counsel
        285 S. Liberty St. Suite 1D
        Powell, Ohio 43065
        (614) 529-8600 PH1
        (614) 300-2764 PH2
        jenobile@ntlegal.com
        Counsel for Plaintiff